Filed 8/17/21  P. v. Wu CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>HONG RI WU,<br><br>        Defendant and Appellant. | A156073<br><br>(City and County of San Francisco<br>Super. Ct. No. SCN 220623) |

A jury convicted appellant Hong Ri Wu of two counts of second degree murder for killing two people, and it found that he was sane at the time of the killings.  Wu argues on appeal that the trial court committed instructional error in both the guilt and sanity phases of the trial, and that the prosecutor committed reversible misconduct during closing argument.  We reject these contentions and affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Wu worked at a store on Jefferson Street in the Fisherman's Wharf area of San Francisco.  He had an ongoing dispute with a man and a woman who worked in an adjacent store over whether both stores were permitted under their leases to sell the same types of merchandise.  Around 8 p.m. on January 30, 2011, Wu entered the adjacent store and shot them both.  After

1

hearing the gunshots, a woman who worked nearby came to the scene, and Wu told her to call police and said, "I killed them." Wu was still in the store when a security guard arrived. A gun was on a store counter, and Wu told the guard he had shot the victims, who died at the scene. Wu later gave a recorded statement to police acknowledging that he had killed the victims.

Wu was charged by felony complaint with two counts of murder. (Pen. Code, § 187, subd. (a).)[1] The trial court suspended proceedings after Wu's attorney raised a doubt about Wu's competence under section 1368 so that Wu could be evaluated. In June 2012, the trial court ruled that Wu was competent to stand trial and reinstated criminal proceedings. But trial did not begin until March 2014, at which point Wu's attorney again raised a doubt about Wu's competence because of his erratic behavior. After the trial court declined to suspend court proceedings or hold a second competency hearing, the trial was held in Wu's absence, and a jury convicted him of two counts of first degree murder. On appeal, this court concluded that the trial court erred in not holding a second competency hearing and reversed in a nonpublished opinion. (*People v. Wu* (Jan. 20, 2017, A142265).)

On remand, Wu entered a plea of not guilty by reason of insanity. There was no dispute at trial that Wu committed the murders. The only question was the degree. The prosecution argued that Wu committed first degree murder, while the defense argued that Wu had committed voluntary manslaughter in the heat of passion. This time, a jury found Wu not guilty of first degree murder but convicted him of two counts of second degree murder. Jurors also found true firearms allegations under section 12022.53, subdivision (d).

---

[1] All statutory references are to the Penal Code unless otherwise specified.

Following the sanity phase of trial, jurors found that Wu was sane at the time he committed the murders. The trial court sentenced Wu to consecutive terms of 15 years to life on the murder convictions, plus consecutive sentences of 25 years to life on the enhancements, for a total of 80 years to life in prison.

## II.
### DISCUSSION

*A. There Was No Error in Instructing the Jury With CALCRIM No. 359.*

    1. Additional Background.

Evidence was presented of several of Wu's out-of-court statements. One was Wu's statement immediately after the shootings to the woman who worked nearby. She testified at trial that Wu told her, "I killed them. Call the police now." Another statement was made to a security guard who arrived at the scene shortly after the shootings. Wu told him, "I think I shot them." Other statements were made to a police officer who arrived at the scene, placed Wu in handcuffs, and left him with the security guard while checking the store for victims. When the officer returned to escort Wu to a patrol car, Wu said, "I shot those two." When they were closer to the patrol car, Wu asked the officer, "Can you watch my gun for me?" Finally, when Wu was at the police station, he waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 and spoke with police.[2] Wu admitted shooting the victims and made other incriminating statements.

The trial court instructed the jury without objection under CALCRIM No. 359 (Corpus Delicti: Independent Evidence of a Charged Crime) as follows: "The defendant may not be convicted of any crime based on his out-

---

    [2] The trial court denied the defense's pretrial motion to exclude Wu's statements to police under *Miranda*, and a video recording of the interview was played for the jury.

3

of-court statements alone.  You may rely on the defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime was committed.  [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.  [¶] This requirement of other evidence does not apply to proving the identity of the person who committed the crime and the degree of the crime.  If other evidence shows that the charged crime was committed, the identity of the person who committed it and the degree of the crime may be proved by the defendant's statements alone.  [¶] You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

　　　　　　2.  Analysis.

Wu contends that the instruction "fundamentally undercut the state's burden of proof as to the murder counts," in violation of his Fifth and Sixth Amendment rights under the federal Constitution, because it permitted the People to prove the murder charges with less than proof beyond a reasonable doubt.  We are not persuaded.

We first agree with respondent that Wu forfeited this argument by failing to object in the trial court.  (*People v. Valdez* (2004) 32 Cal.4th 73, 113 [defendant's failure to either object to proposed instruction or request additional language be given forfeits claim on appeal].)  But we nonetheless consider, and reject, the argument on the merits to forestall any possible claim of ineffective assistance of counsel.

As recently as August 2019, our Supreme Court has affirmed the rule set forth in CALCRIM No. 359 as an accurate statement of law.  (*People v. Capers* (2019) 7 Cal.5th 989, 1003.)  In *Capers*, the defendant argued that because no physical evidence or eyewitness testimony corroborated his

4

inconsistent and contradictory statements about his involvement in the charged crime, his admissions were insufficiently corroborated and could not be the sole basis of his conviction. (*Id.* at p. 1002.) The court explained that California does not follow the federal corroboration rule but instead follows the corpus delicti rule, which prohibits a conviction based on a defendant's statements alone but requires only slight independent proof of the crime. (*Id.* at pp. 1002–1003.) The court quoted with approval the standard CALJIC instruction on corpus delicti given in that case. (*Id.* at p. 1003.) Like CALCRIM No. 359, the standard instruction provides that the identity or degree of a crime may be established by a defendant's confession or admission. (CALJIC No. 2.72; see also *Capers*, at p. 1003 [a "defendant's words alone may establish the degree of his crime"].) We disagree that the accurate instruction given to the jury lowered the prosecution's burden of proof, especially in light of the fact jurors were also instructed explicitly that the prosecution had the burden to prove Wu guilty beyond a reasonable doubt (CALCRIM No. 220).

Wu further contends that his out-of-court statements did not prove first degree murder, as opposed to acting in the heat of passion. But these were questions for the jury to decide, and the accurate instructions provided cannot be the basis for setting aside the verdict.

B. *The Prosecutor Did Not Commit Error in His Closing Argument.*

1. Additional Background.

As we have said, Wu did not deny at trial that he killed the victims but contended that he acted in the heat of passion. Jurors thus were instructed under CALCRIM No. 570 (Voluntary Manslaughter: Heat of Passion—Lesser Included Offense (Pen. Code § 192(a))) that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if defendant killed someone

5

because of a sudden quarrel or in the heat of passion." The instruction further provided that Wu killed in the heat of passion if (1) he was provoked, (2) as a result of the provocation he acted "rashly and under the influence of intense emotion that obscured his reasoning or judgment," and (3) "[t]he provocation would have caused a person of average disposition to act rashly and without due deliberation." In other words, the instruction includes both a subjective and objective component. The instruction also states that "[t]he People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find Defendant not guilty of murder."

During closing argument, the prosecutor told jurors that they should convict Wu of two counts of first degree murder and that Wu had not acted in the heat of passion when he shot the victims. The prosecutor stated that jurors must determine whether there was sufficient provocation to have caused a person of average disposition to "become obscured by angry passion." Wu's attorney objected that this misstated the law because "angry passion" was not required, but the trial court overruled the objection.

During the defense's closing argument, counsel argued that Wu had been sufficiently provoked such that the killings amounted to voluntary manslaughter because they were committed in the heat of passion.

In rebuttal, the prosecutor argued that the evidence supported first degree murder convictions. He focused on evidence of Wu's mental state, including Wu's statements that he had been thinking about killing the victims every day in the two weeks leading up to the murders. He discussed the elements of killing in the heat of passion and noted there were both subjective and objective elements. After reading an excerpt from the relevant

6

jury instruction he continued, "What I just read is the objective part of the equation. The subjective part is getting the defendant—proving that the defendant himself was so provoked and so overcome by this tidal wave of emotion and passion that he was unable to reason properly; that his judgment, his ability to judge was gone, was gone. So he—" Wu's counsel objected that this argument "obscured . . . the standard," but the objection was overruled, and the trial court told jurors that they "ha[d] the instructions on the law" and that counsel's statements were "about what he thinks the facts show."

The prosecutor returned to his argument that Wu's passions had not subjectively been aroused. He argued, "The second hurdle is that you don't let individuals in our society make a determination on their own that their sensibility is so aroused that they lost the ability to reason and to exercise judgment. They're not allowed to do that. That's just the substantive [*sic*] prong of that equation. [¶] Now we go to the objective. Would a person of ordinary disposition under the same circumstances have had his or her ability to reason and engage in judgment that this tidal wave of passion and emotion would have prevented them from reasoning and exercising judgment? Look at the evidence. The defendant hasn't even satisfied the first prong, the subjective part because—" Defense counsel again objected that this argument was "shifting the burden," and the trial court again overruled the objection. The trial court explained, "Remember the burden of proof is on the prosecutor. It does not leave him."

Counsel continued to summarize the evidence he said supported findings of first degree murder, noting that Wu brought a gun to his store about a week before the murders, which showed planning and deliberation. He stressed that "you have the bodies, the mechanisms that did the killing,

7

and the defendant's own statement. That's all you need. What more could be necessary to prove the elements of those crimes? So the defendant has failed—excuse me, there's no evidence that the defendant was provoked to the extent that his reasoning and his judgment were totally obscured." The trial court granted a motion to strike the prosecutor's statement that Wu "ha[d] failed" because it amounted to burden shifting.

The prosecutor continued, "There's no evidence to establish that the defendant satisfied the first prong of—," at which point the trial court overruled a defense objection that the prosecutor was shifting the burden to defendant. But the trial court told the jury, "I will clarify. I'll say it again. Mr. Wu is presumed to be innocent. He doesn't have to present any evidence. The prosecutor has the burden of proof. He had it at the beginning of the case. He has it now. It never leaves his shoulders." The prosecutor continued that "the instruction also tells you that the defendant must have acted under the direct and immediate influence of provocation. In my looking at the evidence, it does not appear that he established that subjective prong of being provoked to an extent that there would be a flood-tide of emotion and passion that would obscure his ability to exercise judgment and reasoning." Rebuttal argument ended a short time later, with the prosecutor again urging the jury to convict Wu of first degree murder.

2. Analysis.

Wu argues that the prosecutor committed error by "turn[ing] the burden of proof on its head" in suggesting that it was Wu's burden to prove he was sufficiently provoked. Again, we are not persuaded.

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so

8

egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819.) "When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1202–1203.) In reviewing the prosecutor's comments to the jury, "we must view the statements in the context of the argument as a whole." (*Id.* at p. 1203.) " 'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 772.)

Wu contends that "the prosecutor here repeatedly shifted th[e] burden to the defense" by suggesting that it was Wu's burden to prove he was sufficiently provoked. We do not infer that meaning from the prosecutor's statements. The prosecutor was required to prove a negative— that Wu "did *not* kill as the result of a sudden quarrel or in the heat of passion." (CALCRIM No. 570, italics added.) As the prosecutor put it to the jury, this required proof of Wu's mental state despite the fact that "we don't have an x-ray machine that we can use to get exactly what the thought process was." The prosecutor thus was essentially arguing what Wu's *actions and statements* showed, as opposed to what Wu himself was required to prove. This admittedly led to somewhat awkward wording. For example, at one point the prosecutor said that "[t]here's no evidence to establish that the

9

defendant satisfied the first prong . . . ." A more precise wording would have been that Wu's *actions and statements* did not satisfy the subjective element of provocation, but this meaning was clear from the context of the entire argument to the jury. The prosecutor also said that "[t]he subjective part is getting the defendant—proving that the defendant himself was so provoked and so overcome by this tidal wave of emotion and passion." True, it was the People's burden to show Wu was *not* so provoked, but again, we conclude this was clear from the context of the argument as a whole.

That the burden was on the People was especially clear given the instructions to the jury, both before and during argument. Again, jurors were told that "[t]he People ha[d] the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion" and that if that burden was not met they must find Wu not guilty of murder. (CALCRIM No. 570.) And in response to a defense objection that the prosecutor was shifting this burden, the trial court said again that "Mr. Wu is presumed to be innocent," and that "[t]he prosecutor has the burden of proof." (See *People v. Young* (2005) 34 Cal.4th 1149, 1196 [any prejudice flowing from misstatement to jury cured by court's prompt admonition].)

Finally, we reject Wu's argument that it was reversible prosecutorial misconduct when counsel described the objective standard of provocation as follows: "It's an abstract person and you determine whether or not the provocation, if there was sufficient provocation, would have caused this abstract person of average disposition to have his judgment, his reasoning become obscured by *angry passion*." (Italics added.) As Wu argued below, the phrase "angry passion" was a misstatement of the law because, as set forth in the instruction given to jurors, "[h]eat of passion does not require

10

anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection." (CALCRIM No. 570; accord, *People v. Breverman* (1998) 19 Cal.4th 142, 163.) "We conclude that the prosecutor's transgression, if any, was minor and neither deceptive nor reprehensible." (*People v. Young, supra,* 34 Cal.4th at p. 1196; see also *People v. Beltran* (2013) 56 Cal.4th 935, 949 [standard for provocation is that "*anger* or other passion" must be strong enough such that the defendant's reaction bypassed rational thought process], italics added.)

In sum, we reject Wu's argument that the prosecutor committed misconduct, let alone that any such error was prejudicial. Because we have rejected both his arguments about the guilt phase of trial, we likewise reject his contention that the cumulative effect of the supposed errors requires reversal. (*People v. Kipp* (1998) 18 Cal.4th 349, 383 [issues raised on appeal did not singly or cumulatively establish prejudice requiring reversal of convictions].)

## C. There Was No Instructional Error in the Sanity Phase of Trial.

### 1. Additional background.

CALCRIM No. 3450 is the standard jury instruction for determinations of insanity and must be given sua sponte when a defendant has entered a plea of not guilty by reason of insanity. (§ 25, subd. (b).) In addition to mandatory language defining whether a defendant was insane at the time of the defendant's crimes, it includes optional language explaining that a defendant found to be legally insane at the time of the crime would not be released from custody. This portion of the instruction is not mandatory but must be given upon a defendant's request. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 144, fn. 17; *People v. Kelly* (1992) 1 Cal.4th 495, 538.) The purpose of the instruction is to help the defense by informing the jury not to

find the defendant sane out of concern that he or she will be released from custody. (*DeHoyos*, at pp. 144–145.)

The trial court discussed with the parties the optional language before instructing the jury following the sanity phase of trial. During a discussion of jury instructions in chambers, defense counsel indicated that the optional language should be provided to the jury.

The court instructed the jury with the optional language of CALCRIM No. 3450 as follows: "If you find the defendant was legally insane at the time of his crimes, he will not be released from custody until a court finds he qualifies for release under California law. Until that time he will remain in a mental hospital or outpatient treatment program, if appropriate. He may not, generally, be kept in a mental hospital or outpatient program longer than the maximum sentence available for his crimes. If the state requests additional confinement beyond the maximum sentence, the defendant will be entitled to a new sanity trial before a new jury. Your job is only to decide whether the defendant was legally sane or insane at the time of the crimes. You must not speculate as to whether he is currently sane or may be found sane in the future. You must not let any consideration about where the defendant may be confined, or for how long, affect your decision in any way." Jurors were further instructed that "[y]ou must reach your verdict without any consideration of punishment." (CALCRIM No. 3550.)

2. Analysis.

Although Wu did not object to the jury instruction below, he now argues that it was "simply wrong" for the instruction to reference an outpatient treatment program, because it suggested that Wu would be eligible for outpatient treatment. He contends that both the trial court and his trial counsel had a duty to modify the instruction so that it was clear Wu

12

could not "simply be released back into public after trial," and that the error was prejudicial because jurors might have reached their verdict based on a mistaken belief that Wu "could be immediately released into outpatient treatment." We are again not persuaded.

We first agree with respondent that Wu forfeited the issue by failing to ask the trial court to omit from the instruction language about outpatient treatment. (*People v. Valdez, supra*, 32 Cal.4th at p. 113.) But the claim also fails on the merits. True, it was highly unlikely that Wu would have been granted outpatient treatment had the jury found that he was insane at the time of the murders, and he would not even have been eligible before at least 180 days of inpatient treatment. (§§ 1601, subd. (a) [limits on outpatient treatment for persons convicted of murder], 1603, subd. (a) [criteria for persons convicted of murder to be placed on outpatient status], 1604 [procedure].) But considering the instructions as a whole we conclude they were not misleading. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016.)

This conclusion is supported by *People v. DeHoyos, supra*, 57 Cal.4th 79. The defendant there asked that the standard CALJIC instruction be modified to remove any reference to the possibility of outpatient treatment. (*Id.* at pp. 144–145.) The trial court declined to omit all references because that would inaccurately lead jurors to believe that the defendant could never be removed from a mental hospital until he had either recovered his sanity or served the maximum term of confinement. (*Id.* at p. 145.) But the court agreed to modify the instruction to indicate that any outpatient treatment would depend on the seriousness of his present mental illness and the seriousness of the crimes for which he was committed. (*Ibid.*) Wu argues that such a modification was necessary here. We disagree.

13

In *DeHoyos*, the Supreme Court's rejected the defendant's argument that the instruction should have been further modified to advise the jury that the defendant, like Wu, would have been subject to inpatient treatment for a minimum of 180 days (§ 1601, subd. (a)). (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 146.) The court explained that the purpose of the instruction "is not to give the jury a detailed summary of the outpatient placement procedures and requirements, which are not relevant to the jury's task of considering the defendant's sanity at the time of the offense." (*Ibid.*) The court held that it was sufficient that jurors were told, like the jurors were told here, that the defendant would not be released from custody unless he was qualified under state law and that jurors were not to consider where the defendant might be confined in determining his sanity. (*Ibid.*) We agree with *DeHoyos* that "[t]o have added further specific information regarding the mandated inpatient treatment for a minimum of 180 days . . . would have invited just the kind of jury speculation about defendant's possible early release from confinement that the instruction was designed to forestall." (*Id.* at p. 147.)

The gravamen of the instructions informed the jurors that Wu would not automatically be released from custody if they found him to be insane at the time he committed the murders and that they were not to consider his possible placement when making their sanity determination. Although further clarification might have been appropriate had Wu requested it, failure to provide it did not amount to error, much less prejudicial error requiring reversal. In light of this conclusion, we need not consider Wu's arguments that he was prejudiced by the error or that the failure to request modification of the instruction amounted to ineffective assistance of counsel.

14

### III.
### DISPOSITION

The judgment is affirmed.

_____

Humes, P.J.

WE CONCUR:


_____

Banke, J.


_____

Sanchez, J.

*People v. Wu*  A156073

16