Filed 10/19/22  P. v. Garcia CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>NICOLAUS LEROY GARCIA,<br><br>    Defendant and Appellant. | C093960<br><br>(Super. Ct. No. 18FE012890) |

        After a jury found defendant Nicolaus Leroy Garcia guilty of murder, the trial court sentenced him to prison for 51 years to life and imposed various costs.  On appeal, defendant contends:  (1) the prosecutor refused to grant immunity to a proposed defense witness, and the trial court refused to order the prosecutor to immunize the witness, violating his federal constitutional right to present a defense; (2) the trial court violated his federal constitutional rights by prohibiting him from introducing evidence that DNA

1

on the murder weapon matched DNA connected to two unsolved crimes; and (3) the trial court violated his federal constitutional rights by imposing fines and fees at sentencing without first holding a hearing on defendant's ability to pay under *People v. Dueñas* (2019) 30 Cal.App.5th 1157.  We affirm.

BACKGROUND

*Incidents Before the Shooting*

Around 9:00 p.m. on January 28, 2018, James Hunt was standing with his cousin on the curb of a sidewalk in a Sacramento neighborhood when the door of a white Chrysler driving by swung open and struck Hunt's cousin.  Hunt's cousin recognized the car as belonging to defendant, the nephew of a woman with whom Hunt's cousin had recently broken up.  It appeared to Hunt's cousin that multiple people were inside the car, including his ex-girlfriend, defendant's aunt.

Hunt and his cousin chased the Chrysler in their car, and eventually collided with it on purpose, pushing the Chrysler into a fence.  The driver of the Chrysler fled on foot (the passengers apparently had gotten out moments before the collision).  Hunt and his cousin "hopped out to go catch" the driver, but Hunt's cousin changed his mind and told Hunt:  "[C]ome on, let's get back in the car.  Let's go, . . . we're going to end up going to jail.  It's not worth it."  Hunt ignored his cousin and moved towards the Chrysler.  Hunt's cousin drove away.

Video of the incident showed a car that belonged to Felicia Bauman (a codefendant at trial) arrive at the crash scene moments later.

*The Shooting*

Around 9:45 p.m. that night, a sister of Hunt's cousin saw three people she knew—defendant, codefendant Bauman, and a third person—walking towards an apartment complex in the neighborhood.  About a minute later, she heard gunshots. Moments after the gunshots, she saw defendant running away from the apartment complex "with his hands in his hoodie," followed by Bauman and a third person.

2

Around the same time, a woman visiting her friend who lived in the apartment complex was approached by a man she didn't know (Hunt) who seemed nervous. As the two spoke, the woman saw three people—two males and one female (whom she later identified in a photographic lineup as codefendant Bauman)—walking through the apartment complex. The woman "had a bad feeling," and told the man she had to go. Moments later, she heard gunshots. She saw the female holding a gun.

The friend of the woman who had spoken with Hunt just before the shooting was looking out the front door of her apartment when she saw the outline of a gun firing shots. She could not tell if the shooter was male or female, but she saw several people with the shooter.

Shot multiple times, Hunt was dead.

*Defendant's Police Interview*

In a recorded statement defendant made to police the day after the shooting, he explained he was traveling in a car the night before when he saw a friend driving a white Chrysler crash after being chased by a blue car. Defendant recognized the Chrysler because it used to be his car. After the crash, and after his friend took off running, Hunt got out of the blue car and tried to drive the Chrysler away, but it just revved up and was not going anywhere. Defendant pulled up to the side of the Chrysler because the car was still in his name and said: " 'Hey, hey is everything okay?' And [Hunt] g[ot] out the car and . . . tried to . . . rush [defendant] with a knife." Defendant insisted to Hunt he merely was " 'seeing if everything's okay.' And [Hunt] t[ook] off running . . . ."

Regarding the shooting, defendant initially told police his group was in the apartment complex looking for his aunt to see if she would give them money for gas to get home when they heard gunshots and ran away. "I didn't know who it was, all we heard was gunshots and we got out of there," defendant said.

Later, defendant revised his version of events: Defendant, codefendant Bauman, and defendant's cousin were walking through the apartment complex looking for

3

defendant's aunt when they saw Hunt and he saw them. Hunt told the group he recognized them as the people who had just tried to chase him. Defendant then explained that Hunt "tried to . . . reach for something in his back. And that's when I guess my cousin felt scared for his life," and shot Hunt.

As for the murder weapon, defendant said there would be "a couple people's prints on that gun," including his. Defendant held the gun a few times, but "never . . . d[id] anything with it." As for the location of the murder weapon, defendant shared that he overheard his cousin say he put the gun in his mother's garage on Branch Road. It was "probably . . . tuck[ed] behind something." "[S]tart . . . right by the stereo," defendant suggested.

*The Gun and Its Owner*

Police found the gun used to kill Hunt where defendant indicated it would be, in a garage on Branch Road, behind some speakers. DNA found on the gun belonged to an unknown male. Testing uncovered a "very low level" of DNA belonging to a second person, but was "inconclusive" whether defendant, codefendant Bauman, or defendant's cousin was that second person.

Natalie Abbey bought the gun in 2013 and was the registered owner. She reported the gun stolen in May 2018. Between early July 2018 and early December 2019 (when the jury trial ended), Abbey visited defendant 79 times and received over 700 phone calls from defendant while he was in custody.

*Codefendant Bauman's Testimony*

Bauman testified in her own defense that she, defendant, and defendant's cousin did not know Hunt was in the apartment complex they were walking through that night on their way to a store. Suddenly, defendant pulled Bauman into some bushes. A woman that Hunt was speaking with ran away. Hunt turned around, faced defendant, and "reach[ed] in his back pocket," just before defendant shot him.

4

*Jury Verdicts and Sentencing*

In December 2019, a jury found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a)),[1] and found true the allegation defendant was armed with a firearm in the commission of the murder (§ 12022, subd. (a)(1)). Later, the trial court found true the allegation that defendant had a prior serious felony conviction (§ 667, subd. (a)) that triggered application of California's "Three Strikes" sentencing scheme (§§ 667, subds. (b)-(i), 1170.12).

In April 2021, the trial court granted defendant's motion to strike the five-year prior serious felony enhancement and imposed an aggregate indeterminate sentence of 51 years to life, composed of 50 years to life for the murder (25 years to life, doubled for the prior strike), plus one year for the firearm enhancement.

## DISCUSSION

### I

Defendant claims he was denied his "due process right to present a defense and to challenge the prosecution case" when (1) the prosecutor refused to grant immunity to the proposed witness Abbey so she could testify for defendant, and (2) the trial court refused to order the prosecutor do so. The People argue this claim fails because Abbey's testimony was "not 'clearly exculpatory,' " and defendant has not shown the prosecutor's decision was an intentional effort to distort the factfinding process. We agree with the People.

A. *Additional Background*

In closing argument to the jury, the prosecutor explained how defendant's "decision . . . to kill" was shown by defendant "grab[bing] that [gun] from [his] girlfriend

---

[1] Undesignated statutory references are to the Penal Code.

5

. . . Abbey -- when [he] [took] it out of her house" and had it with him on the night of the shooting.

At trial, defense counsel wanted to introduce evidence that defendant did *not* take the murder weapon from Abbey's house before Hunt's murder. Defense counsel hoped to present to the jury testimony from Abbey that: (1) she last saw the murder weapon in February 2018, several weeks after the murder, (2) she and defendant had broken up in December 2017 and did not get back together until March of 2018, and (3) defendant's cousin had access to her home. Thus, according to defense counsel's theory, Abbey's testimony "can be exculpatory if the jury were to believe that [defendant's cousin] also had access to Ms. Abbey's house and may have taken the weapon because clearly [defendant] wouldn't. They weren't in a relationship at the time."

The problem for defendant was that Abbey refused to testify, invoking her Fifth Amendment right against self-incrimination, and the prosecutor refused to grant immunity to her. The prosecutor explained: "I don't believe the evidence unequivocally exculpates anyone." "The People's position on not offering immunity to Ms. Abbey is -- there is a couple of reasons. One, based on Ms. Abbey's 402 hearing, I don't find her to be credible. [¶] Two, I believe that her testimony is tainted in that she has received discovery, other people's statements. . . . [¶] She's had extensive conversations, I assume, about the case with [defendant]. And she's actively participated in dissuading witnesses."

The trial court denied defense counsel's request to compel the prosecutor to grant immunity to Abbey.

B. *People v. Masters*

In *People v. Masters* (2016) 62 Cal.4th 1019 (*Masters*), our Supreme Court held "California courts have no authority to confer use immunity on witnesses," and discussed federal case law standing for the proposition that "due process may compel a defense witness to be immunized" by the prosecution. (*Id.* at p. 1051.) The court explained how

6

the relevant federal case law provided that "[i]f a defendant can show that the prosecutor refused to grant immunity ' "with the deliberate intention of distorting the judicial factfinding process," ' a retrial is necessary." (*Ibid.*)

The federal cases use five factors to evaluate these "claims of prosecutorial misconduct: whether ' "[1] [witness immunity was] properly sought in the [trial] court; [2] the defense witness [is] available to testify; [3] the proffered testimony [is] *clearly exculpatory*; [4] the testimony [is] essential; and [5] there [are] no strong governmental interests which countervail against a grant of immunity." ' " (*Masters, supra*, 62 Cal.4th at pp. 1051-1052, italics added.)

"In California," by contrast, "the law regarding prosecutorial misconduct is settled: 'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' " (*Masters, supra*, 62 Cal.4th at p. 1052.)

Our Supreme Court then explained why—"[e]ven if [it] were to assume" that the relevant federal case law "state[d] the appropriate test"—defendant's "constitutional claim arising from the denial of witness immunity" was unpersuasive: The witness's evidence was *not clearly exculpatory*. (*Masters, supra*, 62 Cal.4th at p. 1052; *ibid.* [because there was "no . . . indication that [the witness] would have testified that [the defendant] was *not* involved in the murder," the proposed testimony "did not *clearly* exculpate" the defendant].)

In *Masters*, the prosecutor had explained that "the reason he did not offer [the witness] immunity was that [the witness] refused to give a tape-recorded statement. The prosecutor *did not act on the basis of an improper motive* in requiring [the witness] to give a recorded statement before offering him immunity. Similarly, the prosecutor

7

[explained] that . . . no evidence was presented to corroborate [the witness's] statements. [Defendant] *failed to show there was no countervailing governmental interest* against granting immunity to [the witness]. [¶] In sum, we cannot characterize the prosecutor's decision not to grant immunity to [the witness] as egregious, unfair, deceptive, or reprehensible. The prosecutor's decision was not misconduct." (*Masters, supra*, 62 Cal.4th at p. 1053, italics added.)

C. *Analysis*

Here, as in *Masters*, defendant's claim is unpersuasive because the testimony of his proposed witness was not clearly exculpatory. As characterized by defense counsel, Abbey's testimony would have suggested that around the time of the murder, defendant's cousin had access to the murder weapon and defendant did not. Whether he had access to the murder weapon at Abbey's home in the weeks before and after the shooting does not negate his presence at the murder scene where that gun was used to kill Hunt. Thus, Abbey's testimony would not have shown defendant was *not involved* in the murder.

Likewise here, as in *Masters*, defendant's claim fails because defendant failed to show the prosecutor acted on the basis of an improper motive in declining to immunize Abbey. The prosecutor explained that, based on proposed testimony developed at an earlier hearing, he "d[idn't] find [Abbey] to be credible," and Abbey's proposed testimony was "tainted" because she knew of other witnesses' statements, probably had "extensive conversations" with defendant about the case, and participated in dissuading a witness. That explanation does not reflect an improper motive. (Cf. *Masters, supra*, 62 Cal.4th at p. 1053 [as the prosecutor explained that "no evidence was presented to corroborate [the witness's] statements," defendant "failed to show there was no countervailing governmental interest against granting immunity"; cf. *People v. Capers* (2019) 7 Cal.5th 989, 1009 ["There is also no indication that the prosecutor committed misconduct when he refused to grant the witness immunity," as "[h]e explained to the court that [the witness] had no credibility"].)

Defendant's contention that the prosecutor engaged in improper "gatekeeping to judge the credibility of a witness as a prerequisite to an immunity grant" is unavailing, both because it (1) frames the issue incorrectly (as it is defendant who has the burden to demonstrate that the prosecutor acted on the basis of an improper motive and without a countervailing government interest), and (2) is inconsistent with the reasoning in *Masters* and *Capers*, excerpted *ante*.

Accordingly, this claim is unpersuasive.

II

Defendant argues the trial court violated his federal constitutional rights to present a complete defense by prohibiting him from introducing evidence that DNA on the murder weapon matched DNA connected to two unsolved crimes. The People disagree, as do we.

A. *Additional Background*

Defendant sought to introduce "third party culpability" evidence that DNA on the gun matched DNA found (1) on a steering wheel connected to a 2015 carjacking and robbery, and (2) on a tire iron connected to a 2017 burglary. The trial court kept that evidence out.

B. *Analysis*

A defendant is entitled to present evidence that a third party, other than the defendant, committed the charged crime if such evidence is "capable of raising a reasonable doubt of [the] defendant's guilt." (*People v. Hall* (1986) 41 Cal.3d 826, 833.) Although the evidence "need not show 'substantial proof of a probability' that the third person committed the act," evidence of "mere . . . opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Ibid*.) Even then, such evidence may be excluded if it is substantially more prejudicial than probative under Evidence Code

9

section 352.  (*People v. McWhorter* (2009) 47 Cal.4th 318, 368.)  We review a trial court order excluding third party culpability evidence for abuse of discretion.  (*People v. Robinson* (2005) 37 Cal.4th 592, 625.)

In this case, defendant's third party culpability evidence showed, at most, that someone who may have handled the murder weapon also may have been involved in two unsolved crimes that occurred years before Hunt's murder.[2]  But as our Supreme Court made clear in *Hall*, evidence of mere opportunity is not enough to admit third party culpability evidence.  (*People v. Hall, supra*, 41 Cal.3d at p. 833 [evidence of mere motive or opportunity of another to commit a crime, without more, is insufficient to raise a reasonable doubt about a defendant's guilt].)  Defendant did not show to the trial court the necessary link between another person and the crime charged.  The evidence would have done nothing more than invite improper conjecture and speculation by the jury.

Even if the third party culpability evidence was inadmissible under state law rules of evidence, defendant argues that federal constitutional provisions required its admission.  We agree with the People that *Holmes v. South Carolina* (2006) 547 U.S. 319 articulates principles that make defendant's constitutional argument unpersuasive.

*Holmes* involved a state law that prohibited a defendant from introducing third party culpability evidence if the prosecution had presented some forensic evidence, that if believed, strongly supported a guilty verdict.  (*Holmes v. South Carolina, supra*, 547 U.S. at p. 321.)  The Supreme Court found the evidentiary rule arbitrary, and hence, unconstitutional, because it improperly focused on the strength of the prosecution's case: "If the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the

---

[2]  Defendant's assertion "[t]he excluded facts" included "that *the gun* had been used in other crimes" is unsupported by any citation to the record.  (Italics added.)

issues." (*Id*. at pp. 329-331.) But *Holmes* made clear that evidentiary rules regulating the admission of evidence proffered by a criminal defendant to show someone else committed a charged crime is not unconstitutional where the rules exclude evidence that does not sufficiently connect the other person to the crime or where the evidence is too speculative or remote. (*Id*. at pp. 326-327.)

Here, that DNA found on the gun was found in other places at other times does not sufficiently connect another person to Hunt's murder. Thus, the exclusion of the evidence, in this case, did not impermissibly infringe on defendant's constitutional right to present a defense. (*People v. Boyette* (2002) 29 Cal.4th 381, 414 [" ' "[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense" ' "].)

Accordingly, this claim is unpersuasive.

### III

Defendant argues the trial court violated his federal constitutional rights by imposing fines and fees at sentencing without first holding a hearing on defendant's ability to pay. The People argue this claim (1) is forfeited on appeal because defendant did not raise this issue in the trial court, and (2) it lacks merit. We agree this claim is forfeited on appeal, and therefore do not address the merits.

A. *Additional Background*

Relevant here, at the April 2021 sentencing hearing, the trial court and defense counsel engaged in the following colloquy:

"THE COURT: [¶] . . . [¶] So having ruled on the motions that have been filed, this is the time for a hearing on the probation report and judgment and sentencing. I have read and considered the probation officer's report . . . . [¶] Counsel, have you timely received a copy of the probation report in this matter and had an adequate opportunity to review it?

11

"[DEFENSE COUNSEL]: "Yes, I believe I have.

"THE COURT: All right. Are there any corrections that need to be made?

"[DEFENSE COUNSEL]: No, just request that the fines and fees be minimized or waived to the greatest extent possible and request the Court consider as low a sentence as possible."

The probation officer's report observed that defendant "refused to participate in the pre-sentence interview," which made it difficult to know "if the defendant was employed or financially responsible for any dependents." Among other things, the probation officer's report recommended imposition of a $10,000 restitution fine pursuant to section 1202.4, and a main jail booking fee of over $450.

By contrast, the trial court imposed a restitution fine of $300, and did not impose the recommended main jail booking fee. The trial court also imposed $680 in victim restitution (§ 1202.4), a mandatory court operations assessment of $40 (§ 1465.8), and a mandatory court facility fee of $30 (Gov. Code, § 70373).

B. *Analysis*

Citing *People v. Dueñas, supra,* 30 Cal.App.5th 1157, defendant argues he was entitled to a hearing on his ability to pay costs the trial court imposed. Defendant acknowledges the trial court imposed costs "more than two years after" *Dueñas* was decided, and insists trial counsel "sufficiently advised the court of the issue and . . . preserve[d] the issue for review." We disagree.

"In making sentencing choices, the trial judge is confronted with a maze of statutes and rules, the intricacy of which rival the Internal Revenue Code. By reason of this complexity and the ever-changing guidelines, sentencing error is not uncommon. In an effort to avoid error, it is therefore reasonable to place the obligation to formulate specific objections squarely on defense counsel, and not on the judge." (*People v. de Soto* (1997) 54 Cal.App.4th 1, 9.) Therefore, "claims of error in the trial court's exercise

12

of its sentencing discretion are [] forfeited if not raised at the sentencing hearing." (*People v. Trujillo* (2015) 60 Cal.4th 850, 856.)

Defense counsel did not mention *Dueñas* at sentencing or argue defendant was unable to pay, thus forfeiting the issue on appeal. (See *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1155.)

We reject defendant's contention that if we conclude the claim is forfeited on appeal, then we should find trial counsel provided ineffective assistance. Defendant has not shown counsel lacked a tactical reason for not objecting to the imposition of costs without a determination of his ability to pay.

"When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the [matter] must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) Here, the record is silent regarding why counsel did not object to the imposition of costs without a determination of defendant's ability to pay, and thus "affords no basis for concluding that counsel's omission was not based on an informed tactical choice." (*Ibid.*) But the record does reflect that defendant refused to participate in a presentencing interview, making his employment and financial status unknown.

Perhaps, in light of defendant's refusal to participate in the presentence interview with a probation officer, counsel believed (1) the trial court would not have been receptive to an argument defendant could not pay costs, and therefore (2) it was better simply to ask the trial court to "minimize[]" costs "to the greatest extent possible," rather than invoke *Dueñas*.

Accordingly, defendant forfeited this claim and has failed to show ineffective assistance of trial counsel.

## DISPOSITION

The judgment is affirmed.

                                                /s/
                                      BOULWARE EURIE, J.

We concur:

      /s/
ROBIE, Acting P. J.

      /s/
HULL, J.