Filed 7/15/25  P. v. Alligood CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LILA ALLIGOOD,<br><br>        Defendant and Appellant. | A169661<br><br>(Marin County Super. Ct.<br>No. SC194874C) |

In 2017, defendant Lila Alligood pleaded guilty to two counts of murder.  In each case, it was Alligood's boyfriend who shot and killed the victim during a robbery.  In 2022, Alligood filed a petition for resentencing under former Penal Code section 1170.95 (now section 1172.6).  Following an evidentiary hearing, the trial court denied the petition.

On appeal from the denial of her resentencing petition, Alligood first asks this court to review the sealed transcript of an in camera hearing to determine whether the trial court properly allowed her former codefendant to assert the Fifth Amendment privilege at the evidentiary hearing.  Second, she contends no substantial evidence supports the trial court's determination that she is guilty of murder under current law.  Alligood argues no reasonable fact finder could find that she was a major participant who acted with reckless indifference to human life in either of the two robberies.

1

We have reviewed the sealed transcript and find no error. We also conclude substantial evidence supports the trial court's findings that Alligood is guilty of both murders under current law. Accordingly, we affirm the trial court's order denying Alligood's petition for resentencing.

**FACTUAL AND PROCEDRUAL BACKGROUND**

*Underlying Charges and Negotiated Pleas by Alligood and Two Confederates*

By information filed in October 2016, the Marin County District Attorney charged Alligood and codefendant Morrison Haze Lampley with the murder of Steven Carter (Pen. Code,[1] § 187; count 1); second degree robbery of Carter (§ 211; count 2); maiming, wounding, torturing, and mutilating a living animal (§ 597, subd. (a); count 3); taking a vehicle without the owner's consent (Veh. Code, § 10851, subd. (a); count 5); receiving a stolen vehicle (§ 496d, subd. (a); count 6); receiving stolen property, to wit, the backpack, sleeping bag, passport, tarp, and camping equipment belonging to Audrey Carey (§ 496, subd. (a); count 8); the murder of Carey (§ 187; count 9); and second degree robbery of Carey (§ 211; count 10).[2]

In April 2017, Alligood entered guilty pleas to count 1 (first degree murder of Carter) and count 9 (first degree murder of Carey) pursuant to a negotiated disposition, and the trial court imposed the agreed-upon sentence of 25 years to life for count 1 and 25 years to life for count 9, with the latter sentence to be served consecutively.

---

[1] Further undesignated statutory references are to the Penal Code.

[2] Three theories of first degree murder were alleged for counts 1 and 9: "1) willful, deliberate, and premeditated murder, 2) lying in wait, and 3) felony murder, the underlying felony being . . . second degree robbery." Counts 4 and 7 were alleged against Lampley only.

Alligood's codefendant, Lampley, similarly reached a plea agreement in 2017, under which he entered guilty pleas to two counts of first degree murder, admitted he personally discharged a firearm and caused death in the commission of each murder, and stipulated to an aggregate sentence of 100 years to life in prison in exchange for dismissal of the remaining charges.

Previously, Sean Angold, who participated in the crimes with Alligood and Lampley, also reached a plea agreement. In April 2016, Angold agreed to testify against his confederates in exchange for being permitted to plead guilty to second degree murder of Carter with a 15-year-to-life sentence and the dismissal of all other charges.

*Current Proceedings – Alligood's Petition for Resentencing*

In March 2022, Alligood filed a petition for resentencing. After the prosecution agreed she made a prima facie showing, the trial court held an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3), over three days in October and November 2023.

<u>The Prosecution's Evidence at the Evidentiary Hearing</u>

The prosecution argued Alligood was ineligible for resentencing because she was guilty of each murder under two theories: first, she aided and abetted murder with express or implied malice and, second, she "is guilty of first degree felony murder in that she was a major participant who acted with reckless indifference." The prosecution primarily relied on accomplice Angold's preliminary hearing testimony and statements Alligood made following her arrest a few days after the murders. The prosecution also introduced Alligood's post-arrest letters to Lampley written while they were in jail, surveillance video showing Alligood after the second murder, and additional testimony and documentary evidence.

*Angold's Preliminary Hearing Testimony*

At the preliminary hearing in September 2016, Angold testified as follows. Angold, Alligood, and Lampley were arrested in Portland, Oregon, on October 7, 2015. Lampley had a gun when they were arrested. Before the arrest, Angold had been with Alligood and Lampley for about 10 or 11 days; the three had travelled together from San Francisco to Oregon.

It was Angold who found the gun (that Lampley later had) in San Francisco. The gun was in a pouch inside an unlocked truck, and Angold handed the gun to either Lampley or Alligood. Their arrangement was that Lampley would keep the gun during the day and Angold would hold it at night.

The day after they acquired the gun, Angold, Alligood, and Lampley were sitting by a bike path near Ocean Beach smoking methamphetamine when they met their first victim, Audrey Carey. Carey asked to sit with them; she sat with them for a while, and they went to get pizza together. The four then walked back toward the beach, and Angold, Lampley, and Alligood all discussed robbing Carey.

Angold, Alligood, Lampley, and Carey sat down "in the bushes off to the side of a road" in Golden Gate Park and "were just kicking it, talking." Angold left "to take a leak" and when he returned, "Alligood had jumped across the circle and had tackled" Carey. Alligood "was straddling Audrey [Carey]'s midsection," and Lampley was at her head; Angold saw Lampley hit Carey in the face. Alligood had a rope "to try and tie up her hands" and "when that didn't work," Alligood threw the rope to Angold who "loosely wrapped it around Audrey's legs to try and keep her from running after us." Carey said, "like, 'Get off of me,' and, 'What are you guys doing?'" Lampley pulled out the gun and said, "'Shut up, bitch or I'll kill you.'" Carey said,

4

" 'Just kill me then,' " and Angold "heard a pop." Angold "said, 'What the hell happened,' and [Lampley] said, 'She's dead dude. Don't worry about it.' "

Alligood and Lampley took Carey's backpack, and Lampley went through it. Angold took Carey's headlamp and sleeping bag. He tried to use one of Carey's credit cards, but it did not work.

Around the time of Carey's murder, Angold, Lampley, and Alligood had been talking about going to Oregon. Lampley "said, somewhere in northern Oregon, there was property [they] could go to to grow pot." The day after Carey's murder, the three walked across the Golden Gate Bridge. In Sausalito, Angold stole a bike; Alligood and Lampley were traveling with longboards. They spent a night on a bike path and then headed north to Fairfax. They tried hitchhiking but couldn't get a ride.

Angold, Alligood, and Lampley decided they "needed to come up with a ride or a vehicle to continue north because it was going too slow with longboards and a bike." They decided to shoot someone to obtain a vehicle. Angold testified, "We did not really plan it out. We just said we were going to rob someone for a vehicle." Asked whether they had a plan to use the gun, he responded, "At that point in time, it ended up to where we all decided, yes, we were going to shoot the individual to get the car keys."

When they came up with the plan, they had "nobody in particular" in mind to rob, until they saw a man, later identified as Steven Carter, drive by in a gray Volkswagen. Carter parked nearby and started walking his dog. Alligood suggested Carter as their target.

Angold, Alligood, and Lampley got their gear and walked to the area where Carter had parked. They looked for Carter but did not find him, so they sat down and waited for him to return. They waited around 15 to 20 minutes. When Carter returned and walked by them, Angold got up to move

his stolen bike and "heard someone else get up . . . and start walking the opposite direction." Angold "heard 'What are you doing, man?' And then, all of a sudden, [he] heard a shot."

Angold testified, "At first, I seen the individual that we were supposed to rob kind of, like, turn around and stagger back, and then from there I seen Mr. Lampley with the gun in both hands and he fired another handful of rounds, but they were in, like, two, and couple more, and another one." The dog was shot in the eye, and it cried.

Alligood picked up her and Lampley's gear. Lampley went through Carter's pockets and removed his keys. The three loaded their gear in Carter's Volkswagen, Alligood got in the driver's seat, Lampley sat in the front passenger seat, and Angold sat in the back behind Alligood.

Alligood drove to a gas station, and Angold took some money to the bathroom to wash blood off it. From there, they drove to Portland. Alligood drove the first stretch, and then she and Angold took turns driving. (Lampley did none of the driving.)

When he was arrested in Oregon, Angold denied he had any part in planning the robberies. At the preliminary hearing, Angold admitted he told many, and detailed, lies to the police.

*Alligood's Post-Arrest Statements*

On October 8, 2015, the day after the three were arrested, officers from the Marin County Sheriff's Office and the San Francisco Police Department conducted videotaped interviews of Alligood in Oregon, and the video and transcripts of the interviews were admitted in evidence.

Initially, Alligood told investigators from Marin County that Angold had borrowed the Volkswagen from a friend, and she had no idea it was stolen. She denied knowing that a person had been shot. When told there

6

were witnesses who placed her in the area where the victim (Carter) was found, Alligood said, "I'm pretty sure it was Sean [Angold] that had done that" "because he wasn't there when like we had stopped and we were kickin' it and then like we heard gunshots and then like there was a car."

While maintaining she "didn't see any of it," Alligood said, "Sean shot him okay," and afterward she was "really more scared than anything to like be in the car with someone who has a gun and knows how to use it and will shoot somebody."

At the end of questioning, a detective told Alligood that she would be taken back to her cell, and she responded, "Wait. Actually." Then she said she was "scared" and, "like I get kind of get coerced to tell a different story but no, I saw Sean shoot the man." Alligood said everything else she had said was true, "except I saw it happen" and, "I watched Sean do it." She told the detectives, "I've never seen that before. Oh, my god, there was so much blood! Oh, my god!" She said she "had no idea that's what was gonna happen."

Next, Alligood spoke with San Francisco police officers. She said Lampley was her "husband" and they had been together for two years, and she denied he was abusive to her or to others.

Alligood said she would give the police her "full cooperation." She maintained that Angold killed Carter and said she "thought he was gonna kill [her] next." Asked whether the group had any problems with anyone in San Francisco, Alligood answered, "No, nothin' happened in San Francisco." She denied she met any "new people" or "fellow travelers" in San Francisco.

A detective then told Alligood that she was "not being truthful with [them]," and he knew Alligood "met this girl" because "[t]here's video all over the place." At that point, she said, "Sean shot her. That was the first one.

I've never been involved in anything like this before.  I've never.  I'm a small-time drug addict and small-time thief.  I've never, ever, ever been around people who do this stuff before. . . ."

Later in the interview, Alligood admitted that she and her confederates had intended to rob Carey.  She said, "We were just gonna rob her, like grab her money so like I sat on her like I was gonna pull the money out and then like she was asking . . . just please kill me . . . .  And then like I, I stood up, I stood up and I wasn't gonna do anything.  Like I had already gone through her pockets . . . .  I didn't get anything and like I was done.  I was over it.  And like I stood back up and then like she was asking to be killed.  She's asking to be killed then he shot her."

A detective told her, "[I]f you want to protect [your boyfriend], that's fine," but they "talked to [Lampley] already" and "[t]hat's not the story he told us."  Alligood responded, "Okay fine, I'm protecting someone I love.  He was the one who shot her in the head and Sean was sitting behind me. I was sitting in the middle.  I was gonna tie her up 'cause we were just gonna rob her and leave and then he was, the girl was asking please just kill me, please just kill me, please just kill me and [Lampley] lost it.  And he shot her in the head . . . ."

*Additional Evidence*

Several letters Alligood wrote and sent to Lampley in October and November 2015 while they were held in the Marin County Jail were admitted in evidence.  Alligood repeatedly wrote she was "obsessed" with Lampley and, by her own count, expressed her love for him approximately 40 times.  She

addressed Lampley as "Clyde," more than once. (E.g., "Please never leave me Clyde. I need you. I love you. I'm obsessed with you.")[3]

Surveillance video from a gas station in Point Reyes Station recorded soon after Carter was murdered showed Alligood driving Carter's Volkswagen to the gas station and getting out of the car and Angold handing her money stolen from Carter.[4] Alligood, without her confederates, is seen inside the gas station store with a clerk; Alligood is smiling.

Defense

*Alligood*

Alligood testified at the evidentiary hearing as follows. She turned 18 about three months before the murders. She began smoking marijuana when she was about 13 years old, and "it quickly escalated into a heavy addition of meth and heroin." She was expelled from school for drug possession, arrested for stealing and drug possession, and she ran away from home. She was homeless and "prostituting [her]self for drugs." She would "take money from . . . purses" and "pick pocketed and traded for drugs."

Alligood met Lampley "because [they] were in the same group of people that were using together." Alligood was in a relationship with a man named Robert that "had gotten increasingly violent." She asked Lampley "if he could beat up Robert for [her] because [she] wanted to get away, and Lampley did." They stole some of Robert's things to buy more drugs. Alligood had consensual sex with Lampley, but later that night, Lampley hit Alligood,

---

[3] Alligood testified that she referred to herself and Lampley as "Bonnie and Clyde."

[4] In cross-examining Alligood, the prosecutor played the surveillance video. Alligood agreed it showed Angold handing her "money that was stolen from the victim that was just killed."

9

dragged her naked by the hair, and "forced [her] to perform oral sex on him." She ran away, but Lampley followed her and told her she "had nowhere to go and nobody that wanted [her]," and she returned to him.

Lampley was physically abusive. His "punishment" of Alligood included anal rape, and he burned her with cigarettes and lighters and hit, pushed, and stabbed her. Lampley told Alligood if she tried to go back to her family, he would kill her mother or sister and make her watch. She didn't leave him because she "was scared and [she] also loved him" and was "heavily co-dependent on him."

Alligood was in juvenile hall for a few months shortly before the murders. When she was released to a halfway house, she ran away and immediately went back to Lampley.

Alligood and Lampley began hanging out with Angold in San Francisco in early October 2015. When Angold found a gun in a car, "Lampley was really excited about it."

The three of them met Carey in Ocean Beach. Alligood and Lampley talked "about maybe pick-pocketing her, or the fact that she might have extra cash that we could take to use to get drugs." This was something Alligood had done before.[5] Angold "pulled out the gun and he put it to the side of Audrey [Carey]'s neck." "Lampley jump[ed] up and the two of them kind of wrestled Audrey down to the ground." Alligood "sat across Audrey's mid-drift [*sic*] . . . because [she] was going to go through her pockets and rob her." Asked about the rope, she responded, "I think Angold had the rope. I know that he was behind me by her legs. I think that Angold had it." At some point, "the gun had switched hands," and Lampley "shot Audrey in the head."

_____

[5] In cross-examination, Alligood agreed she was involved in the plan to rob Carey, and she knew her confederates had a gun and ammunition.

10

It was "[o]nly a couple of seconds" from the time Carey was pushed to the ground to when Lampley shot her. Alligood did not talk about the shooting with Lampley.

The next day, the three walked over the Golden Gate Bridge. Eventually, they walked to Fairfax. They talked about stealing a car. Alligood denied choosing a target or discussing who might be a good target to take car keys from. She denied that they discussed shooting Carter. Lampley got up and walked toward Carter while holding the gun "out in front of him" with two hands. Alligood watched Lampley "fire quite a few shots into Steven [Carter]." She denied that she knew Carter was going to be shot.

Lampley gave her Carter's car key and told her to drive. They stopped for gas at Point Reyes Station, and she bought cigarettes using cash taken from Carter. Alligood agreed that she had an opportunity to ask somebody for help, but she did not.

Alligood agreed that she lied a lot in her interviews with police after her arrest in October 2015. She testified, "Honestly, after all of the lying that I've done . . ., I wouldn't believe me either, or anything I had to say. . . . Learning to be honest was very difficult. And it was something I had to practice a lot in prison." She remained loyal to Lampley after their arrest for at least six months; she told her mother he had never been violent with her, but that was not true. Lampley came up with the idea of calling themselves "Bonnie and Clyde."

Alligood was evaluated by Dr. Walzer and, more recently, Dr. Gregory. She testified that she was honest with them "[f]or the most part" and commented, "I'm still evolving." She told Dr. Gregory she was involved in the planning of the robbery of Carey and the robbery of Carter. Asked whether she had lied to a social worker about the Carter robbery and murder, Alligood

11

responded that it was "really hard . . . sometimes to tell what was a lie and what was not a lie" because she "lied about so much."

*Defense Expert*

Psychologist Amanda Gregory testified as an expert in neuropsychology, forensic psychology, and adolescent development. She explained the pre-frontal cortex of the adolescent brain "isn't fully developed yet," and that can lead to "emotional d[y]sregulation and impulsive behavior." She testified that "methamphetamine intoxication can result in poor judgment, disinhibited behavior, [and] misperceptions," chronic use can cause lasting brain damage, and "[i]t's not uncommon [for people using heavily] to have memory deficits."

Dr. Gregory met with Alligood in April 2023 for 10 hours over two days. Cognitive testing showed no impairments, and Alligood's scores "ranged from average to superior in terms of her cognitive functioning." In a psychological evaluation at juvenile hall in 2015, "the examiner indicated that [Alligood] was making up a lot of stories and being manipulative," and an evaluation after her arrest "suggested there was some exaggeration of symptoms." But Gregory's testing showed "no indication of malingering or minimizing of problems."

Dr. Gregory diagnosed Alligood with "substance-use disorders, the opiates, and the stimulant or methamphetamine currently in a controlled environment, so no current symptoms" and "other specified stressor or trauma-related disorder." She testified that "often people stay in abusive relationships because they lack the financial or other resources to leave," "they don't see an alternative," "drugs can sometimes numb people to the actual emotions that are distressing," and "[s]ometimes people don't leave because of fear of retaliation."

<u>Trial Court Ruling</u>

At a hearing on December 8, 2023, the trial court denied Alligood's petition and stated its reasons in a detailed ruling.

Addressing the relative credibility of Angold and Alligood, the trial court noted that in some respects, they were consistent, but where they were not, the court "believed a little more of" Angold's testimony because "there was additional corroboration." The court "considered strongly[] the fact that, in an effort to protect her boyfriend, who Ms. Alligood now describes as 'violent, menacing and abusive', she told the police that a third party, Sean Angold, was the actual killer of both [victims] . . . . [¶] The fact that Ms. Alligood was able and willing to throw blame on somebody else to protect her boyfriend made me think to myself: What would she be willing to do to protect herself?" The court also found her post-arrest behavior to be inconsistent with her statements to the police and some of her testimony at the evidentiary hearing. The court believed Alligood and Lampley were in an unhealthy relationship and Lampley was abusive but found these circumstances did not "provide any defense and/or excuse" for Alligood's own conduct in the murders.

As to both counts 1 and 9, the court determined Alligood was a major participant in the underlying robbery and acted with reckless indifference to human life and, therefore, she is guilty of both murders under current law.

## DISCUSSION

A. *Codefendant's Assertion of Fifth Amendment Right Not to Testify*

Alligood asks this court to review the sealed transcript of a closed hearing outside the presence of the parties and their attorneys in which the trial court and counsel for codefendant Lampley discussed Lampley's assertion of the privilege against self-incrimination.

13

1.    Background

At the evidentiary hearing, the defense called Lampley to testify. Lampley admitted he pleaded "guilty to the killing of" both Carey and Carter, and testified Alligood an Angold were his codefendants. However, Lampley's court-appointed counsel advised him not to answer the next question, and he did not. Defense counsel asked questions about the crimes, and Lampley repeatedly responded, "Plead the 5th."[6] Defense counsel asked Lampley whether he ever had sexual contact with Alligood, whether he ever had sex with her against her will, and whether he ever forced her to have sexual contact with others. Again, Lampley invoked the Fifth Amendment.

After Lampley was dismissed as a witness, defense counsel stated that he did not believe Lampley had a Fifth Amendment privilege.

The trial court then explained that, earlier that day, it had an in camera discussion with Lampley's counsel, "And after talking to [Lampley's counsel] it became clear to me that there is a clear theory as to why [Lampley]'s invocation of his 5th Amendment rights applies. And, as a result of that conversation, I accepted that invocation."

Defense counsel "asked that the in camera conversation be reported and sealed for purposes of appellate review." Lampley's counsel stated he was "happy to recite the reasons again" "on the record" but "sealed as an in camera hearing." The court then cleared the courtroom of everyone other than Lampley's counsel and the court reporter, and a discussion was held on

---

[6] For example, defense counsel asked Lampley whether he discussed with Alligood and Angold the possibility of stealing from Carey, where Angold and Alligood were when he (Lampley) shot Carey, where they were when he shot Carter, how much time elapsed between the time he began to rob Carey and when she was killed, and whether Alligood used any drugs the day Carter was killed.

14

Lampley's assertion of the Fifth Amendment privilege. The discussion was reported, and the transcript was sealed.

2.     Review of the Sealed Transcript

Alligood asks this court to review the sealed transcript "to learn Mr. Lampley's counsel's theory as to how Mr. Lampley retained a valid Fifth Amendment privilege years after his guilty pleas, with no appeal or collateral proceeding pending, in light of the [legal] principles discussed" in her opening brief. The Attorney General does not object and asserts this court should review the record as a whole, including the sealed transcript.

"The Fifth Amendment privilege provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15.) The high court has held that the privilege 'marks an important advance in the development of our liberty.' (*Kastigar v. United States* (1972) 406 U.S. 441, 444.) It 'must be accorded liberal construction in favor of the right it was intended to secure.' (*Hoffman v. United States* (1951) 341 U.S. 479, 486 . . . .) Recognizing that the trial court must determine whether there is reasonable cause for the privilege to extend to the witness, *Hoffman* left it to the court to determine whether the witness's 'silence is justified.' (*Ibid*.) *Hoffman* instructed: 'To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." ' " (*People v. Capers* (2019) 7 Cal.5th 989, 1010–1011.)

15

"[A] witness's answers need not in themselves support a conviction under a criminal statute, [the privilege applies when an answer] may 'furnish a link in the chain of evidence' needed to prosecute the witness for a crime." (*People v. Trujeque* (2015) 61 Cal.4th 227, 267.)

"[A] trial court may deny Fifth Amendment privilege only if it is ' "perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] cannot possibly have such tendency" to incriminate.' [Citation.] Our state jurisprudence is equally strong in its protection of the right and holds that the Fifth Amendment does not allow 'the court to assess the likelihood of an actual prosecution in deciding whether to permit the privilege.' " (*People v. Capers*, *supra*, 7 Cal.5th at p. 1011.)

With the foregoing principles in mind, we have reviewed the sealed transcript, and we see no error in the trial court's determination that Lampley properly invoked his Fifth Amendment privilege in this case.

B. *Sufficiency of the Evidence*

Alligood's primary appellate claim is that the prosecution failed to present substantial evidence that she was a major participant who acted with reckless indifference to human life in either of the robberies and murders.

1. Applicable Law and Standard of Review

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) narrowed the felony murder rule significantly for defendants who were not actual killers and eliminated second degree murder liability based on the natural and probable consequences doctrine. (*People v. Strong* (2022) 13 Cal.5th 698, 703, 707, fn. 1 (*Strong*); §§ 188, subd. (a)(3), 189, subd. (e).) It also provided a resentencing procedure for those convicted of murder under the former law to have their convictions set aside if they could not be

16

convicted of murder under the law as amended by Senate Bill No. 1437. (*People v. Lewis* (2021) 11 Cal.5th 952, 959; see § 1172.6.)

Under section 1172.6's resentencing procedure, when a petitioner has made a prima facie case for relief, the trial court issues an order to show cause and (unless the prosecution stipulates to resentencing) holds an evidentiary hearing. (§ 1172.6, subds. (c) and (d).) At the evidentiary hearing, "the burden of proof [is] on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

When a person was not the "actual killer" and did not aid or abet the actual killer "with intent to kill," section 189 now limits liability for first degree felony murder to a "person [who] was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2." (§ 189, subd. (e).) By adding the requirements of major participation and reckless indifference to section 189, Senate Bill No. 1437 incorporated the requirements for the felony-murder special circumstance of section 190.2, subdivision (d),[7] as "those requirements [were] elucidated in" the California Supreme Court decisions, *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). (*Strong, supra,* 13 Cal.5th at p. 710.)

In reviewing a trial court's denial of a resentencing petition under section 1172.6, we review factual findings for substantial evidence, and we

---

[7] "When a special circumstance is found under section 190.2, the penalty is death or life in prison without the possibility of parole. (§ 190.2, subd. (a).) Thus, felony murder liability is now limited to murders that are death eligible." (*People v. Underwood* (2024) 99 Cal.App.5th 303, 306, fn. 2.)

17

review de novo the court's application of the law to those facts. (*People v. Hill* (2024) 100 Cal.App.5th 1055, 1066.)

2. <u>Count 9 – Robbery and Murder of Audrey Carey</u>

The trial court found Alligood was a major participant in the robbery of Carey, citing the facts that she agreed with the plan to rob Carey, she knew Lampley and Angold had a gun, she was present at the scene, and she participated in restraining Carey and remained on Carey's body as Carey struggled. The court found Alligood acted with reckless indifference to human life, citing the facts that she knew Lampley had a gun and knew he "was a violent person who threatened to kill people in the past," she actively restrained Carey "making her more vulnerable and increasing the risk of harm to her," she never helped Carey or asked her confederates not to harm Carey, and she stayed with her confederates "for days thereafter until ultimately arrested."

Alligood contends the evidence does not support a finding that she was a major participant or that she acted with reckless indifference to human life. We disagree.

In *Banks*, our high court discussed the factors that may be relevant in determining whether a defendant is a "major participant" in a felony that results in death: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No

18

one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' (*Tison v. Arizona* [(1987)], 481 U.S. [137,] 157) was sufficiently significant to be considered 'major.' " (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.) A defendant is a major participant where the circumstances show she was "substantially involved in a course of conduct that could be found to entail a likelihood of death." (*Id.* at p. 802.)

Here, viewing the record in the light most favorable to the trial court's ruling, the evidence shows Alligood was aware of the "particular dangers posed" based on "past experience" and the conduct of the other participants." (*Banks*, *supra*, 61 Cal.4th at p. 803.) She knew her confederates had a gun and ammunition; she knew Lampley "was really excited about" the gun; and she knew Lampley could be extremely violent—he had beaten up her previous partner at her request, and he abused her physically and sexually and threatened to kill her relatives. Alligood was also aware that the "nature of the crime" (*ibid.*) heightened the risk of death beyond that of "a garden-variety armed robbery, where death might be possible but not probable," (*id.* at p. 802) as the particular robbery she engaged in involved straddling Carey and restraining her with rope, a prolonged physical struggle, and the use of a loaded gun by both Angold and Lampley. Alligood was present at the scene of the killing and arguably "facilitate[d] the actual murder" (*id.* at p. 803) by straddling and restraining Carey, thereby helping Lampley remain close enough to Carey to shoot her in the head at point-blank range. After Lampley used lethal force on Carey, Alligood took Carey's backpack, and, in the days that followed, Alligood continued travelling with her murderous confederates, robbing and killing again.

19

In summary, sufficient evidence supports a finding that Alligood was "substantially involved in a course of conduct that could be found to entail a likelihood of death" (*Banks*, *supra*, 61 Cal.4th at p. 802) and, thus, was a major participant in the robbery of Carey.

"[R]eckless indifference encompasses both subjective and objective elements. [Citations.] 'As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create." ' [Citations.] 'As to the objective element, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " ' " (*People v. Emanuel* (June 2, 2025, S280551) 17 Cal.5th 867, __ [569 P.3d at pp. 381-382] (*Emanuel*).)

"To aid in distinguishing those who knowingly engage in criminal activities known to carry a grave risk of death from other felony perpetrators, *Clark* 'set out a nonexhaustive list of considerations relevant to this determination, including [1] use of or awareness of the presence of a weapon or weapons, [2] physical presence at the scene and opportunity to restrain confederates or aid victims, [3] the duration of the crime, [4] knowledge of any threat the confederates might represent, and [5] efforts taken to minimize risks.' [Citations.] ' "[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient." ' [Citations.] The 'totality of the circumstances' must be analyzed to determine whether the defendant

acted with reckless indifference." (*Emanuel*, *supra*, 17 Cal.5th at p. __ [569 P.3d at p. 382].)[8]

Here, the evidence shows, first, Alligood knew her confederates were armed and had ammunition and, second, she was "physically present at every stage of the crime: planning, execution, dividing the spoils, and flight." (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 592.) Third, the evidence suggests a prolonged interaction between Alligood and her confederates and the victim.[9] Fourth, Alligood knew Lampley was violent and had threatened to kill people in the past. (See *id.* at p. 594 [the defendant's "considerable" "knowledge of his confederate's propensity for violence" supported a finding of reckless indifference].) Fifth, there is no evidence Alligood tried to minimize the potential for violence in the robbery of Carey.

In conclusion, the evidence supports a finding that Alligood "knowingly engage[d] in criminal activities known to carry a grave risk of death from

---

[8] "Because the major participant and reckless indifference elements often ' "significantly overlap" ' " the *Clark* factors considered in determining reckless indifference "also overlap[] with those . . . identified in connection with the major participation inquiry in *Banks*." (*Strong*, *supra*, 13 Cal.5th at p. 706.)

[9] The evidence supports the following sequence of events. Alligood and her two confederates tackled Carey and wrestled her to the ground. Angold pulled out the gun and placed it on Carey's neck. Alligood straddled Carey's midsection and attempted to tie her hands with rope. Alligood failed to secure Carey's hands and tossed the rope to Angold, who wrapped the rope around Carey's legs. Lampley hit Carey in the face while Carey asked what they were doing and said, " 'Get off of me.' " Alligood went through Carey's pockets. The gun went from Angold's hands to Lampley's, and then Lampley threatened to kill Carey and shot her. Alligood described a struggle that lasted long enough that, after going through Carey's pockets, Alligood decided she was "over it" and stood up. "A lengthy interaction between perpetrators and victims of a felony may increase the risk of resistance, conflict, and violence." (*Emanuel*, *supra*, 17 Cal.5th at p. __ [569 P.3d at p. 383].)

other felony perpetrators" (*Emanuel*, *supra*, 17 Cal.5th at p. __ [569 P.3d at p. 382]) and, thus, acted with reckless indifference to human life in the robbery of Carey.[10]

###### 3. Count 1 – Robbery and Murder of Steven Carter

The trial court found Alligood was a major participant in the robbery of Carter, citing the facts that she and her confederates all "agreed with the plan to shoot and rob Mr. Carter so that they could take his car," she "participated in actually selecting Mr. Carter as the victim of this robbery," and she "was clearly aware that this plan would result in the death of Mr. Carter" "[b]ecause, just days earlier, Ms. Carey was killed for less." The court found Alligood acted with reckless indifference citing the same facts, observing that Alligood knew Lampley killed Carey a few days earlier "in a similar robbery scheme."

On appeal, Alligood concedes the murder of Carter is different from the murder of Carey because, by that time, she was well aware that Lampley had been willing to use a gun to kill a robbery victim in Golden Gate Park. She claims, however, that the trial court's "interpretation of the evidence is flawed." This argument is unavailing.

Alligood questions the trial court's finding that she agreed to a plan to shoot Carter for his car, arguing that "is not precisely how Mr. Angold

---

[10] In her opening appellate brief, Alligood makes the "observation" that the trial court did not expressly discuss her youth when it stated the reasons for its ruling. We reject any suggestion by Alligood that we should infer error based on the trial court's silence on the issue of youth. "[W]here a statement of reasons is not required and the record is silent, a reviewing court will presume the trial court had a proper basis for a particular finding or order." (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.)

described events." Here is how Angold's preliminary hearing testimony proceeded after he described their failed attempt at hitchhiking north:

"Q    So what, if anything, did *the three of you* decide to do next?

"A    We started talking amongst ourselves and started deciding we needed to come up with a ride or a vehicle to continue north because it was going too slow with longboards and a bike.

"Q    And did you discuss how you were going to get that vehicle?

"A    We were just going to rob somebody for a vehicle.

"[¶] . . . [¶] . . .

"Q    Did you have a plan to use the gun?

"A    At that point in time, it ended up to where *we all decided, yes, we were going to shoot the individual to get the car keys*.

"Q    You say, 'We all decided.' Whose idea was it, initially, to shoot someone and take their car keys?

"A    Originally, it was Mr. Lampley's.

"Q    Did you object to the plan?

"A    No, sir, I didn't.

"Q    Did Ms. Alligood object to the plan?

"A    No, sir.

"Q    So was there any discussion as to who would be shot in order take their car?

"A    At that point in time, it was nobody in particular, until there was an individual that pulled into the first turnout and kind of looked at us, like, crazy, and then he went out of the first turnout and did a second turnout and then parked his car.

"Q    And who, if anyone—*did anyone suggest that that's the person that would be shot to take their car?*"

23

"[¶] . . . [¶] . . .

"A    At that point in time, we started, like, trying to figure out who we were going to take their car, and *Ms. Alligood turned around and said, 'Well, that guy* that pulled in here, pulled into that second turnout, and he's down there walking his dog somewhere.' " (Italics added.)

This testimony provides sufficient evidence to support the trial court's finding that Alligood agreed with Lampley and Angold to a plan to shoot someone for a car and that Alligood identified Carter as their victim.

Next, Alligood suggests the evidence does not permit a finding that she was a major participant in the robbery of Carter, asserting the question is what she "personally d[id] to contribute to execution of the alleged 'plan,' which was only to tag along."[11]  We are not persuaded.

The evidence shows Alligood agreed to a plan to shoot a victim to obtain a vehicle.  Lampley had shot and killed a robbery victim a few days earlier.  Alligood identified Carter as their target, went with her two confederates to look for Carter, waited with her confederates for 15 to 20 minutes for Carter to return to his car, so they could shoot him for his car key, and after Carter was shot, she immediately got in Carter's car and drove her confederates away from the scene.  There is no question that the planned criminal activity

---

[11] Here, we note that Alligood pleaded guilty to first degree murder of Carter.  "A guilty plea is a judicial admission" that " 'amounts to an admission of every element of the crime and is the equivalent of a conviction.' " (*People v. Rodriguez* (2024) 103 Cal.App.5th 451, 458.)  Senate Bill No. 1437's subsequent changes to section 189 mean her plea no longer amounts to an admission that she is currently guilty of murder.  But Alligood's plea does mean, at the very least, that she admitted she aided and abetted the robbery of Carter that resulted in his death.  (See former § 189, as amended by Stats. 2010, ch. 178, § 51.)  Alligood has thus admitted she did more than "tag along."

24

carried a grave risk of death. Alligood did not merely agree to a "garden-variety armed robbery, where death might be possible but not probable, but [was] substantially involved in a course of conduct that could be found to entail a likelihood of death." (*Banks*, *supra*, 61 Cal.4th at p. 802.) Alligood was aware of the extreme "dangers posed by the nature of the crime" (*id.* at p. 803), which was a plan to rob the victim by *shooting* him, not by simply threatening him with a gun. Alligood knew death was likely given "past experience or conduct of the other participants" (*ibid*.), since she had just seen Lampley shoot and kill someone during a robbery, and she was "present at the scene of the killing" (*ibid*.). This was sufficient evidence for the trial court to determine she was a major participant in the robbery of Carter.

The same evidence supports the trial court's finding that Alligood acted with reckless indifference to human life. Alligood demonstrated "a willingness . . . to assist another in killing . . . to achieve a distinct aim, even if [she did] not specifically desire that death as the outcome of [her] actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.)

In challenging the trial court's finding of reckless indifference, Alligood asserts she "was a runaway, drug-addicted drop-out prostitute who had just turned eighteen and was in a classic abusive relationship from which women rarely escape." But she offers no authority for the proposition that these circumstances mean she cannot be found guilty of murder as a matter of law where the evidence also shows she agreed to a plan to shoot a victim for his car, and she agreed to this plan with a confederate whom she had just seen shoot and kill another victim during a robbery. Her appellate claim is insufficiency of the evidence, and the record contains substantial evidence to support the trial court's findings. It is not enough to argue that a different fact finder could have reached different findings. (*People v. Albillar* (2010) 51

Cal.4th 47, 60 ["If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding"].)

The trial court properly denied Alligood's resentencing petition as to count 1, the murder of Steven Carter.

## DISPOSITION

The trial court's order denying Alligood's section 1172.6 petition for resentencing is affirmed.

_____
Miller, J.

WE CONCUR:

_____
Stewart, P.J.

_____
Desautels, J.

A169661, *People v. Alligood*